1                                                                    O/JS-6

2

3                                          FILED-SOUTHERN DIVISION
                                           CLERK, U.S. DISTRICT COURT
4

5                                              SEP 2 2 2008

6                                          CENTRAL DISTRICT OF CALIFORNIA
                                           BY                    DEPUTY
7

8                    UNITED  STATES  DISTRICT  COURT

9
            FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA
10

11
    MOHAMMAD HONARKAR,                  )      CASE NO. SA CV 06-1188 DOC
12
                       Appellant,       )
13                                      )      O R D E R AFFIRMING FINAL
             v.                         )      ORDER OF BANKRUPTCY COURT
14                                      )
    GSM WIRELESS, INC. , et al.         )
15                                      )
                       Appellees.       )
16                                      )
                                        )
17                                      )
                                        )
18                                      )
                                        )
19   _____   )

20

21          Before the Court is Appellant Mohammad Honarkar's ("Honarkar") Appeal of Order

22   Approving Application for Approval of Employment of Special Counsel and Final Fee

23   Application.  After reviewing the parties' papers, the Court UPHOLDS the Bankruptcy Court's

24   Order Approving Application for Approval of Employment of Special Counsel and Final Fee

25   Application.

26   I.     BACKGROUND

27          A.     General Background

28          Appellee GSM Wireless, Inc. ("GSM") is a California corporation that operated from

1    1998 through early 2006 as an aftermarket seller of cellular telephone products and services. In

2    March 2003, while Appellant Honarkar was the company's Chief Executive Officer ("CEO")

3    and President, GSM entered into seven agency agreements (the "Agency Agreements") with

4    Cingular. Under the Agency Agreements, GSM would become the exclusive distributor of

5    Cingular products and services in various geographic regions. In exchange, Cingular agreed to

6    pay GSM activation commissions, upgrades compensation, and subscriber management fees.

7          By September 30, 2004, GSM had failed to pay $2.7 million owing to Cingular for

8    product purchases it had made. Due to these defaults, on February 11, 2005, GSM and Cingular

9    entered into a Restated Amendment to the Agency Agreements whereby GSM granted Cingular

10   a security interest in its assets in order to secure the outstanding debts. Honarkar and his wife

11   additionally guaranteed GSM's obligations under the Agency Agreements and Restatement

12   Amendment as trustees of the Honarkar Family Trust, secured by a deed of trust not to exceed $1

13   million on their real property located in Laguna Beach, California. Following entry into the

14   Restated Amendment, Cingular advanced commissions and subscriber management fees to GSM

15   so as to finance GSM's purchase of inventory. By May 19, 2005, GSM had again materially

16   defaulted on its obligations under the Agency Agreements as well as its commitment under the

17   Restated Amendment. At that time and as a result of these defaults, Cingular ceased making

18   advances to GSM.

19         On May 19, 2005, GSM filed a petition under Chapter 11 of the Bankruptcy Code in the

20   United States Bankruptcy Court for Central District of California ("Bankruptcy Court"). Shortly

21   after this filing, the Bankruptcy Court terminated Honarkar as CEO and President of GSM and

22   replaced him with a court-appointed "Responsible Officer" who, on GSM's behalf, entered into

23   various agreements with Cingular in order to permit GSM to continue operating. In November

24   2005, the Responsible Officer discovered accounting irregularities relating to the reimbursement

25   of funds to GSM through which it appeared that GSM had knowingly filed false invoices for

26   reimbursements leading to its receipt of significant overpayments from Cingular. Some GSM

27   employees later admitted to falsifying documents to this end at Honarkar's direction. As a result

28   of this investigation, the Responsible Officer terminated Honarkar's employment entirely on

1  January 31, 2006.  The investigation into GSM's overcharging practices then continued

2  following the appointment in January 31, 2006 of its current Responsible Officer, Jeff Nerland.

3  Nerland has estimated GSM's liability to Cingular to be in excess of $1 million.

4  **B.   Retention of K&L Gates Subject to Bankruptcy Court Approval**

5  After filing its voluntary petition under Chapter 11, GSM retained Kirkpatrick &

6  Lockhart Preston Gates Ellis LLP ("K&L Gates"), subject to Bankruptcy Court approval with

7  respect to three matters, described below.

8  **1.   Unfair Competition Lawsuit**

9  The first matter was the defense of an unfair competition lawsuit filed by a dissatisfied

10  purchaser of cellular telephones against GSM and four of its current and former employees.

11  Services for this matter commenced on October 31, 2005.

12  K&L Gates was retained, subject to Bankruptcy Court approval, to defend GSM and four

13  of its employees and former employees ("Individual Defendants").  Cingular was also a

14  defendant in the lawsuit.  The last date to file a response to the complaint in the lawsuit was

15  November 14, 2005.  K&L Gates attempted to extend the deadline and was unsuccessful.  In the

16  time between October 31 and November 14, 2005, K&L Gates prepared an answer and petition

17  to compel arbitration.  The Plaintiff in the action served written discovery on GSM and the

18  Individual Defendants on November 21, 2005.

19  K&L Gates prepared two letters in connection with the lawsuit.  One was a "Consent to

20  Dual Representation" letter addressed to GSM and the Individual Defendants.  The other was a

21  "Confirmation of Engagement" letter addressed to GSM and copied to the Individual

22  Defendants.  These letters disclosed the fact that K&L Gates was representing Cingular in other

23  matters not related to the lawsuit.

24  K&L Gates was retained to defend the lawsuit because of its experience in unfair

25  competition matters.

26  **2.   Internal Investigation**

27  The second matter was an internal investigation regarding accounting irregularities and

28  reimbursement fees that may have been improperly obtained by GSM employees, including the

3

1    Appellant herein.  Work commenced on this investigation on November 23, 2005, shortly after

2    the discovery of the irregularities..

3        The accounting irregularities involved Co-Op Advertising ("Co-Op") and Market

4    Development Fund ("MDF") reimbursement fees that GSM's employees, including its principal

5    shareholder and former president Honarkar, may have improperly obtained from Cingular and

6    other third parties.  In order to investigate these irregularities, K&L Gates was asked primarily to

7    interview GSM's employees regarding their knowledge of the fees.  K&L Gates was not retained

8    to quantify the amount of the reimbursement fees that may have been obtained or assert any

9    claim on behalf of GSM.

10        The attorneys from K&L Gates working on this investigation practice primarily in the

11    area of labor and employment law.  They were selected to work on the matter due to their

12    expertise, so that GSM could ensure that it was in compliance with California and federal

13    employment law.  GSM's bankruptcy counsel could not handle such a matter because he and his

14    firm did not have expertise in labor and employment law matters.

15             **3.    Employment Advice**

16        The third matter involved providing non-adverse employment advice to GSM's human

17    resources department.  Work commenced on this matter on October 31, 2005.  K&L Gates was

18    retained to handle the employment advice engagement because of its expertise in employment

19    matters.  GSM's bankruptcy counsel had no expertise in labor and employment law matters.

20    **C.    K&L Gates' Representation of Cingular in Unrelated Matters**

21        At the time that K&L Gates was retained in the above matters, K&L Gates also

22    represented Cingular in connection with other matters unrelated to the GSM matters.  These

23    matters accounted for 0.06% of the total revenue of K&L Gates in 2004 and 0.08% of the total

24    revenue of K&L Gates in 2005.  These Cingular matters consisted of (1) thirteen intellectual

25    property and patent matters out of K&L Gates' Pittsburgh, Pennsylvania office, the first of

26    which was opened in 2001; (2) two labor and employment litigation matters out of K&L Gates'

27    Newark, New Jersey office, which were opened in 2004; and (3) two unfair competition lawsuits

28    filed by consumers who purchased cellular telephones from AT&T Wireless Services, Inc. stores

handled by K&L Gates' Los Angeles, California office, which were opened in April 2004 and January 2005 and filed against New Cingular Wireless Services, Inc. The latter lawsuits were on appeal at the time, and K&L Gates was instructed to transfer these two matters to another law firm in or about February 2006. Only one attorney who worked on the GSM matters had worked on these latter lawsuits and had not done so since December 2004.

### D.    The Employment Application

GSM's bankruptcy counsel participated in the decision to retain K&L Gates in the GSM matters. GSM's bankruptcy counsel also represented during a March 14, 2006 hearing before the bankruptcy court that it had undertaken the responsibility to prepare and file the employment application.

On January 23, 2006, GSM's bankruptcy counsel filed and served the Notice of Employment Application on behalf of GSM. The application itself was filed and served the next day and included the proposed scope of K&L Gates' employment, the qualifications of K&L Gates, and the terms of the proposed employment. It further disclosed that "KLNG currently represents Cingular in connection with other matters that are not related to the Lawsuit or the other matters described in Section I.B. of the Employment Application." The "Consent to Dual Representation" and "Confirmation of Engagement" letters were attached. Finally, the application stated that there had been a delay in filing the application in order to respond to deadlines in the lawsuit and because GSM was occupied with operational and other issues.

Honarkar filed an opposition to the Employment Application; Cingular did not. In his opposition, Honarkar argued that an actual conflict of interest prevented K&L Gates from representing GSM and that there was no adequate excuse or explanation for K&L Gates' delay in filing the Employment Application.

In response, GSM filed a reply in which it explained in greater detail the GSM matters, K&L Gates relationship with Cingular, and the reasons for the delay filing the Employment Application. Executed copies of the "Consent to Dual Representation" and "Confirmation of Engagement" letters were attached. In addition, GSM attached two additional letters entitled "Consent and Waiver" to the reply. These were executed by K&L Gates, Cingular, and GSM,

5

and disclosed the relationship between K&L Gates and Cingular.  The reply also set forth the

reasons for K&L Gates' services, including K&L Gates' qualifications in unfair competition

litigation and labor and employment law.  It also asserted a need for quick action, based on the

short deadlines in the lawsuit, as well as the serious nature of the internal investigation.  In

particular, the accounting irregularities involved GSM's principal shareholder and president, as

well as GSM's employees, making it important to commence the investigation as soon as

possible.  GSM explained that "K&L Gates's work for the Debtor has been and continues to be

critical in dealing with employment issues and enabling the Debtor to avoid liability on claims

that may be raised by terminated employees."

Finally, the reply explained that the delay in the filing of the Employment Application

occurred due to the resignation of GSM's responsible officer around the time of the initial

retention, GSM's attention to urgent operational issues, impending deadlines in the Lawsuit, and

the extraordinary demands facing GSM and Bankruptcy Counsel, including the need to deal

immediately with critical employment issues raised by the discovery of accounting irregularities.

The reply also stated that "[t]he Debtor suffered no prejudice as a result of the delay, and in fact,

benefitted, as it was able to focus its efforts on preserving the viability of the business and the

value to the estate."

At the March 14, 2006 hearing on the Employment Application, before Judge John E.

Ryan, Bankruptcy Counsel took responsibility for the delay in filing the Employment

Application.  Bankruptcy Counsel explained:

> Our firm, because Mr. Feyder [K&L Gates partner on the GSM
> matters] does very little, if any, bankruptcy estate work and he was
> the partner for the Kirkpatrick firm that was responsible for this
> matter, we agreed like we have with many other special counsels or
> accountants to file the employment application.

Bankruptcy Counsel further explained that one reason for the delay was because they "expanded

the scope of [K&L Gates'] employment."  In addition, Bankruptcy Counsel stated the following:

> I think the significance of the benefit was that we dealt with the

1          situation in . . . in very short order with some very serious issues.

2          We continue the relationship with Cingular.  We're in a position now

3          of working with Cingular and the other creditors of this estate,

4          including the IRS, to . . . hopefully sell the stores for a substantial

5          amount of money.  And I don't think if we had delayed things any

6          further that this would have happened. . . . [W]e had to take these

7          steps to do the investigation.  We were absolutely overwhelmed in

8          the month of December. . . . And the . . . civil threats from Mr.

9          Honarkar. . . .

10 Bankruptcy Counsel also reiterated that K&L Gates was not retained to determine whether GSM

11 was ultimately liable to Cingular.

12      At the hearing on March 14, 2006, the Bankruptcy Court granted the Employment

13 Application retroactively.  The court concluded that the excuse for the delay was a weak excuse,

14 but nonetheless found that retroactive approval was appropriate.  The court found that there was

15 no actual conflict of interest and further explained the following:

16          Now, there are other considerations beyond just the reason for the

17          delay, and those factors are whether or not the firm is qualified to be

18          employed, which I find the firm was and is, whether the services

19          have been performed in a professional manner, and there's no

20          evidence that would indicate to the contrary; and whether those

21          services were necessary in the context of the case and the debtor's

22          situation.  I find that the services were necessary in order to deal with

23          the critical issue that arose with respect to the debtor's operations

24          and the ongoing key management persons at the debtor. . . .

25          So, with respect to the actual benefit and . . . whether the fees

26          that are sought warrant payment, those issues will be dealt with at the

27          fee application hearing.  For those reasons, the motion requesting

28          approval of the debtor's application for employment is approved. . . .

1          . . . [t]he requirements of section 327c have also been

2              satisfied.

3   The Bankruptcy Court entered an order approving the Employment Application on April 4,

4   2006.

5          **E.     The Fee Application**

6          On September 11, 2006, K&L Gates filed the Fee Application, seeking the total amount

7   of $170,566.60 for fees and costs generated in the three matters described above and in

8   connection with responding to Honarkar's objections.  The Fee Application detailed the work

9   performed by K&L Gates on behalf of GSM.  Jeffrey Nerland, the Responsible Officer of GSM,

10  executed a declaration in support of the Fee Application in which he stated that he had no

11  objection and added a handwritten note that "[i]t is very unfortunate that K&LNG was forced to

12  spend significant time on employment matters due to the objection from Mr. Honarkar."  GSM

13  submitted additional, supplemental declarations on October 2, 2007.

14         At an October 4, 2006 hearing, the Bankruptcy Court granted the Fee Application and

15  awarded $155,708.10 in fees and costs to K&L Gates.  The court explained the following:

16             [W]hat I'm being asked to do here is to approve the fee application,

17             based on the assumption that the employment was appropriate, that

18             the investigation was appropriate . . . those were decisions made in

19             the context of the hearing as to retroactive employment . . . the

20             question really is whether or not the services were . . . reasonably

21             performed.  I do believe that they were reasonably performed.  I

22             understand [Appellant's counsel's] objection that . . . there were two

23             attorneys involved, but we're talking about an extensive

24             investigation in which there were numerous interviews conduct[ed].

25             And so I don't think there was a duplication of services in that

26             respect.

27                 . . . [T]hese were very serious allegations going to the debtor.

28             And so determining the extent of the problem and the nature of the

1            problem, I think, was important in terms of the case.  And for those

2            reasons, the services that were performed were necessary . . . and I'm

3            in the process of making what I consider to be a reasonable award.

4 The order awarding K&L Gates the sum of $155,708.10, pending the appeal of the Employment

5 Application was entered on November 1, 2006.

6      **F.**    **Erroneously Filed Appeal**

7      On May 24, 2007, Honarkar filed a notice of appeal to the Ninth Circuit Court of Appeals

8 in this action, with Appellate Docket Number 07-55805.  The notice of appeal was erroneously

9 filed in the instant case, as it was an appeal of an order entered in *Mohammad Honarkar v. GSM*

10 *Wireless, Inc., Cingular Wireless II, LLC*, Case No. SA CV 07-00016 DOC.  Due to the

11 improperly filed notice of appeal, this Court was unable to take any action on the instant appeal

12 before this Court.  In response to this problem, the Court directed counsel for Honarkar to file a

13 Notice of Corrected Record to clear up the erroneous filings in each of the two actions on

14 February 1, 2008.  A Notice of Corrected Record was never filed.  Instead, the appeal before the

15 Ninth Circuit with docket number 07-55805 was dismissed by stipulation of the parties.

16 Although there is no notation of this dismissal in the instant case number, the Court hereby

17 deems that the dismissal of Appellate Docket Number 07-55805 noted by Docket Number 24 in

18 Case Number SA CV 07-00016 DOC, applies to the notice of appeal filed in the instant case

19 number on May 24, 2007.  Thus, there is no longer a pending appeal to the Ninth Circuit in the

20 instant appeal, and the Court can now address the substance of the appeal.

21      **G.**    **The Instant Appeal**

22      The following issues are currently before the Court: (1) Whether the Bankruptcy Court

23 abused its discretion by granting the Application of Debtor-in-Possession GSM for Approval of

24 Employment of Special Counsel K&L Gates and Modified Fee Application Procedures

25 ("Employment Application"); (2) Whether the Bankruptcy Court abused its discretion by

26 granting the Employment Application *nunc pro tunc*; and (3) Whether the Bankruptcy Court

27 abused its discretion by granting the Application for Payment of Fees and/or Expenses of K&L

28 Gates ("Fee Application").

1    Honarkar raises four primary arguments in support of his appeal. First, Honarkar claims

2    that GSM failed to adequately demonstrate a need to retain K&L Gates as required by Rule

3    2014(a) of the Federal Rules of Bankruptcy Procedure ("FRBP"). Second, Honarkar argues that

4    the Bankruptcy Court abused its discretion by allowing K&L Gates to represent GSM in the

5    absence of a full, timely, and candid disclosure of K&L Gates' pre-existing relationship with

6    Cingular as required by FRBP 2014(a). Third, Honarkar argues that GSM failed to meet its

7    burden of establishing "exceptional circumstances" in order to justify retention of K&L Gates

8    *nunc pro tunc*. Fourth, Honarkar argues that the Bankruptcy Court abused its discretion by

9    approving the retention of K&L Gates in violation of FRBP 2014(a) and 11 U.S.C. § 327, due to

10   K&L Gates' close connection with Cingular, which Honarkar alleges created a conflict of

11   interest, appearance of impropriety, and questions as to whether K&L Gates could give its

12   undivided loyalty to GSM.

13   **II.    LEGAL STANDARD**

14   The Court typically reviews a challenged decision of the Bankruptcy Court for abuse of

15   discretion. *In re Stolrow's, Inc.*, 84 B.R. 167, 170 (9th Cir. B.A.P. 1988) (dismissal for bad

16   faith). "A bankruptcy court abuses its discretion if it applies the law incorrectly or if it rests its

17   decision on a clearly erroneous finding of a material fact." *In re Brotby*, 303 B.R. 177, 184 (9th

18   Cir. B.A.P. 2003); *see also, In re So. Cal. Plastics, Inc.*, 165 F.3d 1243, 1245 (9th Cir. 1999).

19   To the extent that the decision is based on an incorrect legal conclusion, review is *de*

20   *novo*. *United States v. Furst*, 886 F.2d 558, 580 (3d Cir. 1989). Factual determinations of the

21   bankruptcy court are reviewed for clear error. *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994); *In*

22   *re Villaneuva*, 274 B.R. 836, 840 (9th Cir. B.A.P. 2002). "Clear error exists only when the

23   reviewing court is left with a definite and firm conviction that a mistake has been committed."

24   *In re Brotby*, 303 B.R. 177, 184 (9th Cir. B.A.P. 2003).

25   **III.   DISCUSSION**

26   As a threshold matter, GSM argues that only the appeal regarding the Fee Application is

27   properly before the Court, because Honarkar has failed to request consolidation of this appeal

28   with the prior appeal regarding the Employment Application. Rather than dismissing these

1 issues on a procedural technicality, the Court addresses the substance of the appeal. The Court

2 addresses each of the issues presented in turn and finds that the Bankruptcy Court did not abuse

3 its discretion.

4   **A.   The Bankruptcy Court Did Not Abuse its Discretion by Granting the**

5         **Employment Application**

6   Honarkar argues that the Bankruptcy Court abused its discretion by granting the

7 Employment Application for three independent reasons. Honarkar argues that GSM failed to

8 satisfy FRBP 2014(a) by adequately demonstrating a need to retain K&L Gates. He further

9 argues that FRBP 2014(a) was not satisfied due to a failure provide a full, timely, and candid

10 disclosure of K&L Gates' pre-existing relationship with Cingular. Finally, Honarkar argues that

11 both FRBP 2014(a) and 11 U.S.C. § 327 were violated as a result of K&L Gates' close

12 connection with Cingular.

13   **1.   Need to Retain K&L Gates**

14   Pursuant to FRBP 2014(a), applications for employment of professionals must meet the

15 following requirements:

16   The application shall state the specific facts showing the necessity

17   for the employment, the name of the person to be employed, the

18   reasons for the selection, the professional services to be rendered,

19   any proposed arrangement for compensation, and, to the best of the

20   applicant's knowledge, all of the person's connections with the

21   debtor, creditors, any other party in interest, their respective

22   attorneys and accountants, the United States trustee, or any person

23   employed in the office of the United States trustee. The application

24   shall be accompanied by a verified statement of the person to be

25   employed setting forth the person's connections with the debtor,

26   creditors, any other party in interest . . .

27 FRBP 2014(a).

28   Honarkar argues that the Employment Application failed to justify the employment of

11

K&L Gates as special counsel in violation of FRBP 2014(a).  The Court finds these arguments to be without merit.  The Bankruptcy Court did not commit clear error by approving the Employment Application, and, accordingly, finding that GSM had adequately justified the employment of K&L Gates.

The Court looks to both the Employment Application and the reply filed in support of the Employment Application for the facts demonstrating the necessity for employment.  The circumstances of this case created a complicated situation in which substantial assistance was needed from counsel with different areas of expertise.  Much of this situation was caused by Honarkar's actions.

In the documents, GSM sets forth the specific areas in which additional expertise was needed.  GSM describes K&L Gates' role in the lawsuit due to its expertise and experience in unfair competition litigation.  In addition, these documents state the K&L Gates was retained to handle the internal investigation and employment advice engagement due to its expertise in labor and employment law.  These services were not duplicative, as Bankruptcy Counsel and GSM's employees did not possess expertise in labor and employment matters.  Furthermore, the nature of the investigation, stemming from alleged internal conduct, precluded GSM's employees from interviewing other employees.  Finally, K&L Gates did not quantify dollar amounts or perform accounting functions; thus, its work was not duplicative of GSM's accountants.

For these reasons, the Court finds that Honarkar has failed to leave the Court with a definite and firm conviction that a mistake has been committed by the Bankruptcy Court regarding the necessity of K&L Gates' employment.

### 2. Disclosure of Pre-Existing Relationship with Cingular

Honarkar also argues that the Bankruptcy Court abused its discretion by approving the Employment Application because the Application violated the latter portion of FRBP 2014(a), in that it failed to "set[] forth [K&L Gates'] connections with the debtor, creditors, any other party in interest . . ."  The Court finds this argument to be similarly unavailing.

The Employment Application disclosed that K&L Gates was currently representing Cingular in matters unrelated to the matters for which it was being retained.  K&L Gates later

1  supplemented this disclosure in its reply by explaining the GSM matters in which it was engaged

2  at the time.  A similar disclosure was deemed sufficient in *In re Dynamark, Ltd.*, 137 B.R. 380,

3  381 (Bankr. S.D. Cal. 1991) ("Stroock disclosed that it currently represented SPBC on matters

4  unrelated to the chapter 11 case.").

5       The Court finds that GSM's disclosures were adequate for the purposes of FRBP 2014(a).

6  The Bankruptcy Court did not make a clear error regarding satisfaction of the disclosure

7  requirements.

8              **3.      Alleged Conflict of Interest**

9       Finally, Honarkar argues that approval of the Employment Application was improper in

10  light of the close connection between K&L Gates and Cingular, which allegedly created a

11  conflict of interest, appearance of impropriety, and raised questions as to whether K&L Gates

12  could give its undivided loyalty to GSM.

13       The standards guiding appointment of professionals in bankruptcy cases are set forth in

14  11 U.S.C. § 327.  Section 327(a) reads as follows:

15              Except as otherwise provided in this section, the trustee, with the

16              court's approval, may employ one or more attorneys, accountants,

17              appraisers, auctioneers, or other professional persons, that do not

18              hold or represent an interest adverse to the estate, and that are

19              disinterested persons, to represent or assist the trustee in carrying out

20              the trustee's duties under this title.

21  11 U.S.C. § 327(a).  Section 327(c) further explains:

22              a person is not disqualified for employment under this section solely

23              because of such person's employment by or representation of a

24              creditor, unless there is objection by another creditor or the United

25              States trustee, in which case the court shall disapprove such

26              employment if there is an actual conflict of interest.

27  11 U.S.C. § 327(c).  Finally, Section 327(e) provides for a special purpose appointment as

28  follows:

1    The trustee, with the court's approval, may employ, for a specified
2    special purpose, other than to represent the trustee in conducting the
3    case, an attorney that has represented the debtor, if in the best
4    interest of the estate, and if such attorney does not represent or hold
5    any interest adverse to the debtor or to the estate with respect to the
6    matter on which such attorney is to be employed.

7    11 U.S.C. § 327(e).

8    As set forth in Section 327(c), simple employment by or representation of a creditor is
9    alone insufficient to deny employment; there must be an actual conflict of interest.  In *In re*
10   *Dynamark*, the court explained the following:

11   Only the concurrent representation of conflicting interests
12   disqualifies an attorney from representing a debtor-in-possession.  *In*
13   *re McKinney Ranch Associates*, 62 B.R. 249 (Bankr. C.D. Cal.
14   1986).  In the instant case, Stroock continues to represent SPBC on
15   matters totally unrelated to the Chapter 11 proceeding. Thus, any
16   potential conflict that may exist is too remote to warrant
17   disqualification on these grounds.

18   *In re Dynamark*, 137 B.R. at 381.

19   Here, there was no actual conflict of interest because the GSM matters in which K&L
20   Gates was retained were unrelated to the Cingular matters in which K&L Gates was involved.
21   Any potential conflict was too remote to warrant disqualification.  The GSM matters, which
22   consisted of the unfair competition lawsuit, the internal investigation, and the employment
23   advice engagement, were unrelated to the Cingular matters, which consisted of thirteen
24   intellectual property and patent matters out of Pittsburgh, two labor and employment litigation
25   matters out of Newark, and two unfair competition lawsuits out of Los Angeles.  The simple fact
26   that K&L Gates represented Cingular in matters for which there has been no showing of any
27   relation to the GSM matters is too remote to warrant disqualification.  The Bankruptcy Court did
28   not abuse its discretion by finding that the requirements of section 327(c) had been satisfied, as

1 | there was no actual conflict of interest.

2 |       Furthermore, K&L Gates representation of GSM in the GSM matters was not adverse to

3 | Cingular.  With respect to the unfair competition lawsuit, GSM and Cingular were co-defendants

4 | and K&L Gates did not represent Cingular.  The evidence further indicates that GSM had agreed

5 | to indemnify Cingular in the lawsuit.  For the employment advice engagement, K&L Gates

6 | simply provided employment advice to GSM's human resources department regarding GSM's

7 | employees.  With respect to the internal investigation, K&L Gates was not retained to quantify

8 | the amount of the reimbursement fees that may have been improperly obtained or assert any

9 | claims on behalf of GSM.  In addition, K&L Gates was not retained to determine whether GSM

10 | was liable to Cingular.  Instead, K&L Gates was simply obtained to conduct interviews of GSM

11 | employees and gather information regarding accounting irregularities and potential termination

12 | of GSM employees.  These actions did not create an actual conflict of interest or an interest

13 | adverse to the estate.  Instead, K&L Gates was hired to resolve issues that needed to be resolved

14 | for the benefit of the estate.  In addition, although the conflict waiver letters executed by GSM

15 | and Cingular are not alone sufficient to overcome a lack of disinterestedness, it warrants

16 | consideration that both GSM and Cingular executed conflict waiver letters, particularly when

17 | combined with the above facts. *See In re Dynamark*, 137 B.R. at 381.

18 |       Finally, contrary to Honarkar's contention, K&L Gates is not precluded from the

19 | requirements of 11 U.S.C. § 327(e).  Honarkar argues that K&L Gates was precluded from

20 | qualifying under this section because K&L Gates had not previously represented GSM.

21 | However, many courts have held that a debtor may employ special purpose counsel who have

22 | represented a creditor, as long as the other requirements of the section have been met.  *See, e.g.,*

23 | *In re Adam Furniture Indus., Inc.*, 191 B.R. 249, 258-59 (Bankr. S.D. Ga. 1996); *In re Fondiller*,

24 | 15 B.R. 890, 892 (9th Cir. B.A.P. 1981).  Here, K&L Gates was retained for a specified, special

25 | purpose of representing GSM in the GSM matters.  The representation was in the best interests

26 | of the estate, because the representation was necessary to allow the estate to proceed with the

27 | other matters related to the bankruptcy case.  In addition, because the GSM and the Cingular

28 | matters were unrelated, K&L Gates did not hold an interest adverse to GSM or the estate

15

1  regarding its special purposes.

2      Thus, in light of these considerations, the Bankruptcy Court did not abuse its discretion

3  by finding that there was no actual conflict of interest and that approval of the Employment

4  Application was proper.

5      **B.      The Bankruptcy Court Did Not Abuse its Discretion by Granting the**

6          **Employment Application *Nunc Pro Tunc***

7      Honarkar argues that the Bankruptcy Court abused its discretion by granting *nunc pro*

8  *tunc* approval of professional fees.  In the Ninth Circuit, "retroactive approval should be limited

9  to situations in which 'exceptional circumstances' exist."  *In re Atkins*, 69 F.3d 970, 974 (9th

10  Cir. 1995) (citations omitted).  "To establish the presence of exceptional circumstances,

11  professionals seeking retroactive approval must satisfy two requirements: they must (1)

12  satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that

13  their services benefitted the bankrupt estate in a significant manner."  *Id.* (citations omitted).

14      Here, the Bankruptcy Court found that retroactive approval was appropriate by looking to

15  the circumstances surrounding the appointment.  The Bankruptcy Court found that the excuse for

16  delay was weak, but nonetheless granted retroactive approval.  Honarkar has failed to

17  demonstrate that the Bankruptcy Court abused its discretion by implicitly finding that, although

18  weak, the explanation for failure to receive prior judicial approval was satisfactory in light of the

19  context of the case.

20      A number of factors help to explain GSM's failure to seek prior judicial approval.  In

21  particular, several very serious issues arose in this action over a short period of time, requiring a

22  quick response time.  As set forth in *In re Atkins*, one reason that speaks in favor of a satisfactory

23  explanation for a failure to receive prior approval is if the services were performed on an

24  emergency basis. *See In re Atkins*, 69 F.3d 970, 977-978 (9th Cir. 1995).  K&L Gates had only

25  14 days to respond to the complaint in the unfair competition lawsuit.  In addition, as indicated

26  in the Employment Application, GSM was tied up with operational and other issues during the

27  time that K&L Gates was retained for its services.  Furthermore, the internal investigation,

28  which arose in part due to Honarkar's actions, was time sensitive in order to ensure compliance

1 | with employment law and resolve the issues.  Finally, the employment advice engagement
2 | concerned ongoing operations of GSM and was, therefore, time sensitive.  By addressing these
3 | issues on an emergency basis, GSM and K&L Gates were able to resolve outstanding problems
4 | so that GSM could move forward and attempt to sell the stores and recover money on behalf of
5 | the creditors.  These complicated and serious circumstances that arose, combined with GSM's
6 | explanation that it was engaged in operational and other issues, support the conclusion that the
7 | Bankruptcy Court did not abuse its discretion when it granted retroactive approval of the
8 | professional fees.  The combination of all of the circumstances support this conclusion.

9 |      In addition, K&L Gates' engagement benefitted GSM's estate.  By filing an answer and a
10 | petition to compel arbitration in the unfair competition lawsuit, GSM and the Individual
11 | Defendants were able to avoid a default judgment as well as a jury trial.  The internal
12 | investigation and employment advice allowed GSM to avoid potential employment liability
13 | claims and preserve the viability and value of the business.  As explained by the Bankruptcy
14 | Judge, "I find that the services were necessary in order to deal with the critical issue that arose
15 | with respect to the debtor's operations and the ongoing key management persons at the debtor."
16 | In other words, these were not additional services that served no benefit to the estate, but they
17 | were instead crucial services that needed to be conducted.  The Bankruptcy Court further
18 | explained regarding the internal investigation, "And so determining the extent of the problem
19 | and the nature of the problem, I think, was important in terms of the case.  And for those
20 | reasons, the services that were performed were necessary."  In other words, the actual benefit
21 | arose from the determination of the problem, which allowed the case to proceed in a fashion that
22 | would ultimately benefit the estate and seek recovery for the creditors.  The manner in which
23 | these absolutely necessary services were provided conferred a significant benefit to GSM by
24 | allowing it to proceed.  Thus, it was not an abuse of discretion to approve the *nunc pro tunc*
25 | services and find that these services were crucial to the benefit of the estate.

26 |      Such a conclusion is further supported by the additional findings of the Bankruptcy Court
27 | that K&L Gates was qualified to be employed and that the services were performed in a
28 | professional matter.  Finally, additional factors set forth in *In re Twinton Properties Partnership*,

1    27 B.R. 817, 819-820 (Bankr. M.D. Tenn. 1983), which the Ninth Circuit has held may be

2    considered in *In re Atkins*, 69 F.3d at 974-975, support retroactive approval of the K&L Gates'

3    employment.  Specifically, GSM expressly contracted with K&L Gates to perform services on its

4    behalf and approved entry of the *nunc pro tunc* order.  Notice of the Employment Application

5    was served on creditors and interested parties; Honarkar was the only party to object.  The

6    services were performed in good faith and necessary for the benefit of the estate, making

7    Honarkar's objections unreasonable, particularly because the objections increased the burden on

8    the estate.  In addition, there is no indication that the services were performed improperly,

9    inefficiently, or to a poor standard of quality.

10      For all of these reasons the Court finds that the Bankruptcy Court did not abuse its

11    discretion in granting *nunc pro tunc* approval of the Employment Application.

12      **C.**    **The Bankruptcy Court Did Not Abuse its Discretion by Granting the Fee**

13                 **Application**

14      Although Honarkar purports to appeal the granting of the Fee Application, Honarkar

15    hardly addresses this Fee Application in his briefing.  Instead, Honarkar focuses on the approval

16    of the Employment Application.  There has been no showing that the Bankruptcy Court abused

17    its discretion in granting the Fee Application.  The Bankruptcy Court acted properly within its

18    discretion in determining that "the services that were performed were necessary" and that the

19    award granted was a "reasonable award."  As discussed above, K&L Gates' employment was

20    necessary in order to ensure that professionals with proper expertise were employed to address

21    the important and relevant issues.

22

23

24

25

26

27

28

**IV.     DISPOSITION**

For the reasons set forth above, the Court hereby AFFIRMS the Bankruptcy Court's Order Approving Application for Approval of Employment of Special Counsel and Final Fee Application.

IT IS SO ORDERED.

DATED: September 22, 2008

_David O. Carter_
DAVID O. CARTER
United States District Judge

# NOTICE PARTY SERVICE LIST

**Case No.**  SA CV 06-1188 DOC     **Case Title**  GSM Wireless Inc et al v. GSM Wireless Inc et al

**Title of Document**  ORDER AFFIRMING FINAL ORDER OF BANKRUPTCY COURT

| | |
|---|---|
| | ADR |
| ✓ | BAP (Bankruptcy Appellate Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | MDL Panel |
| | Ninth Circuit Court of Appeal |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| ✓ | US Attorneys Office - Criminal Division -S.A. |
| ✓ | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service -  Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

**ADD NEW NOTICE PARTY**
**(if sending by fax, mailing address must also be provided)**

Name:

Firm:

Address (*include suite or floor*):

*E-mail:

*Fax No.:

* For CIVIL cases only

**JUDGE / MAGISTRATE JUDGE (list below):**

**Initials of Deputy Clerk**  kh

G-75   (08/08)                    NOTICE PARTY SERVICE LIST